UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO

------------------------------------------------------------

KEVIN J. POTTS,                                :
                                               :          Case No. 3:18-cv-451
            Petitioner,                        :
                                               :
vs.                                            :          OPINION & ORDER
                                               :          [Resolving Doc. 1]
WARDEN NEIL TURNER,                            :
                                               :
            Respondent.                        :

------------------------------------------------------------

JAMES S. GWIN, UNITED STATES DISTRICT JUDGE:

Petitioner Kevin J. Potts, an Ohio inmate serving an aggregate 17-year sentence for felonious assault and aggravated burglary with firearms specifications, petitions this Court for federal habeas corpus relief under 28 U.S.C. § 2254.[1]  Potts argues that his Fifth Amendment double jeopardy right, his Sixth Amendment confrontation right, and his Fourteenth Amendment due process right to conviction beyond a reasonable doubt were violated during his state trial.[2]  The state of Ohio opposes Potts's petition.[3]  For the following reasons, the Court **DENIES** Potts's petition.

I.    BACKGROUND

A.  *State Trial Proceedings*

The facts surrounding Potts's convictions were described by the Ohio Court of Appeals.[4]  Because Potts has not meaningfully disputed them, this Court accepts them as correct[5]:

---

[1] Doc. 1.
[2] *Id.*
[3] Doc. 9.
[4] *State v. Potts*, 69 N.E.3d 1227 (Ohio Ct. App. 3d Dist. 2016).
[5] 28 U.S.C. § 2254(e)(1) ("In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.").

Case No. 3:18-cv-451
Gwin, J.

{¶ 2} This case stems from a June 25, 2015 altercation between Potts and the victim, John Shepard ("John"), in which Potts was alleged to have appeared at John's house and attempted to assault John with a gun by entering the house and pointing the gun at him. Potts was motivated to confront John after Potts's girlfriend, Lori Welly ("Welly"), alleged that John, a corrections officer with the Hancock County Sheriff's Office, raped her while she was an inmate at the Hancock County Justice Center in the fall of 2014. Welly was released from the Justice Center in September 2014 and told Potts that John raped her while she was an inmate. As a result of Welly's statement, Potts twice called John, and Potts and Welly went to John's house on September 29, 2014 to confront John. Welly later pled no contest to providing false information during an official investigation concerning her report about the rape and was sentenced to 90 days in jail, with 85 of those days suspended. As a result of her sentence, Potts decided that he needed to confront John before Welly was to serve her sentence at the Hancock County Justice Center.

{¶ 3} On June 30, 2015, the Hancock County Grand Jury indicted Potts on two counts, including: Count One of aggravated burglary in violation of [Ohio Revised Code §§] 2911.11(A)(2) and 2903.11(D)(1)(a), a first-degree felony, and Count Two of felonious assault in violation of [Ohio Revised Code §] 2903.11(A)(2), a second-degree felony. (Doc. No. 1). Both counts of the indictment included a specification under [Ohio Revised Code §] 2941.145 alleging that Potts committed the offenses with a firearm. (*Id.*).

{¶ 4} On July 8, 2015, Potts appeared for arraignment and entered pleas of not guilty. (Doc. No. 4).

{¶ 5} On September 24, 2015, Potts filed a request for a bill of particulars, which the State filed on September 29, 2015. (Doc. Nos. 59, 60).

{¶ 6} The State filed a motion on December 3, 2015 requesting Welly to be called as the court's witness. (Doc. No. 94). The next day, the State filed a motion in limine to exclude Potts from introducing any evidence from John's personnel file and a motion for a jury view. (Doc. Nos. 95, 96). At trial, the trial court granted the State's motions for a jury view and for Welly to be called as the court's witness. (Dec. 7–10, 2015 Tr., Vol. I, at 7, 9). Regarding the State's motion in limine, the trial court concluded that Potts could conduct a limited inquiry as to John's credibility based on his personnel file. (Dec. 7–10, 2015 Tr., Vol. III, at 549).

-2-

Case No. 3:18-cv-451
Gwin, J.

{¶ 7} The State filed amended bills of particulars on December 7 and 9, 2015. (Doc. Nos. 97, 102).

{¶ 8} The case proceeded to a jury trial on December 7–10, 2015. On December 10, 2015, the jury found Potts guilty as to the counts and specifications in the indictment. (Doc. Nos. 104, 105); (Dec. 7–10, 2015 Tr., Vol. IV, at 811–813). The trial court filed its judgment entry of conviction on January 21, 2016. (Doc. No. 114). That same day, the trial court sentenced Potts to seven years in prison on Count One, seven years in prison on Count Two, and three years in prison on the specification on Count One, and ordered that Potts serve the terms consecutively for an aggregate sentence of 17 years. (Doc. No. 116); (Jan. 21, 2016 Tr. at 28–29). The parties stipulated that the specifications in Counts One and Two of the indictment merged, and the trial court merged the specifications. (Doc. No. 116).

\*     \*     \*     \*     \*

{¶ 14} At trial, the State offered the testimony of Deputy Terrill Brooks ("Deputy Brooks") and Sergeant Michael Cortez ("Sergeant Cortez") of the Hancock County Sheriff's Office regarding the September 29, 2014 incident. (Dec. 7–10, 2015 Tr., Vol. II, at 251–252). First, Deputy Brooks testified that, on that date, he responded to a trespassing complaint made by John against Potts. (*Id.* at 253–254, 257). He testified that he initiated a traffic stop of Potts and Welly in response to John's complaint. (*Id.* at 255–257, 260). According to Deputy Brooks, Potts admitted to him that he and Welly went to the Shepard residence, and admitted that he had a gun in his vehicle behind the driver's seat. (*Id.* at 262–263).

{¶ 15} Second, Sergeant Cortez testified that he assisted with the September 29, 2014 traffic stop of Potts. (*Id.* at 269, 271–275). According to Sergeant Cortez, Potts admitted that he and Welly were coming from the Shepard residence and that Potts took the gun "for protection." (*Id.* at 278–281). He testified that Potts told him that he took the gun for protection because Welly told Potts that John sexually assaulted her while she was an inmate at the Hancock County Justice Center. (*Id.* at 282). However, Sergeant Cortez testified that Potts told him that he left the gun in his car while he was at the Shepard residence. (*Id.*). According to Sergeant Cortez, John and John's wife, Kim Shepard ("Kim"),

-3-

Case No. 3:18-cv-451
Gwin, J.

> [W]ere not wanting to do anything, as far as pursue any type of
> criminal charges, or anything like that. However, they did want
> a criminal trespass warning issued to [Potts and Welly], and that
> if they had returned, they would then file charges for said crime.

(*Id.* at 282–283). Sergeant Cortez testified that he "verbally gave [the criminal trespass warning] to [Potts]," and testified that trespass warnings do not expire. (*Id.* at 283–284).

{¶ 16} On cross-examination, Sergeant Cortez testified that neither Potts nor Welly threatened anyone on September 29, 2014. (*Id.* at 285).

{¶ 17} As its next witness, the State called Detective Barry Boutwell ("Detective Boutwell") of the Hancock County Sheriff's Office who testified that he investigated Welly's complaint that John sexually assaulted her. (*Id.* at 290–291, 293–295). He testified that he was unable to substantiate Welly's claims based on the information that she provided to him. (*Id.* at 308–310, 314–316). According to Detective Boutwell, because Welly's allegations were unfounded, Welly was charged with "providing false information during an official investigation." (*Id.* at 316–317). (*See also* State's Exs. 2, 3).

{¶ 18} The trial court called Welly as its witness. (*Id.* at 338, 340). On the State's examination, Welly testified that she went with Potts to the Shepard residence on September 29, 2014 "to speak with [John's] wife." (*Id.* at 350–352). According to Welly, she knew Potts had a gun in his vehicle. (*Id.* at 352). Welly testified that Kim answered the door and that Welly "asked her if she was married to John Shepard," and Welly testified that is when John came to the door. (*Id.* at 353, 356). According to Welly, she and Potts then left the Shepard residence. (*Id.* at 356).

{¶ 19} Welly further testified that she later pled no contest to the providing-false-information-during-an-official-investigation charge, was found guilty, and was sentenced to 90 days in jail, with 85 of those days suspended. (*Id.* at 361–362). (*See also* State's Exs. 2, 3). She testified that she was sentenced on June 25, 2015 for that crime, but was not to report to serve her jail sentence until a later date. (Dec. 7–10, 2015 Tr., Vol. II, at 362–363). According to Welly, Potts was upset by her sentence, "but he wasn't overly angry. He was concerned that [she] was serving jail time again." (*Id.* at 363).

-4-

Case No. 3:18-cv-451
Gwin, J.

{¶ 20} On the defense's examination, Welly testified that she and Potts left the Shepard residence on September 29, 2014 when they were asked to leave. (*Id.* at 367). According to Welly, neither she nor Potts threatened anyone on September 29, 2014. (*Id.*). Welly testified that she did not believe that Potts intended to cause John harm when Potts returned to the Shepard residence on June 25, 2015. (*Id.*).

{¶ 21} As its next witness, the State called Lieutenant Christopher Bell ("Lieutenant Bell") of the Hancock County Sheriff's Office. (*Id.* at 375–376). Lieutenant Bell identified as State's Exhibit 4 a true and accurate copy of the 911 emergency call that the Hancock County Sheriff's Office received from Kim on June 25, 2015, which was subsequently played for the jury. (*Id.* at 385–386).

{¶ 22} Next, the State called Deputy Matthew Brunswick ("Deputy Brunswick") of the Hancock County Sheriff's Office who testified that he responded to the Shepard residence on June 25, 2015. (*Id.* at 390, 396–398). When he arrived at the scene, he saw Potts and John "struggling right at the entrance of the base of the porch, where it meets the driveway." (*Id.* at 401–402). He testified that he saw both men with both of their hands on the gun struggling for control of it. (*Id.* at 418). He testified specifically,

> So the suspect had the gun, his hands down, I can't say exact position, but somewhat facing downward, and then Mr. Shepard has his hands both onto [sic] the firearm. So both people were struggling, and as this is going on, they're obviously both moving around, and the gun is, for the most part, seemed like it is pointed downward at that time.

(*Id.* at 423).

{¶ 23} According to Deputy Brunswick, when he arrived at the scene, he immediately exited his patrol vehicle and heard John yelling "he's got a gun, he's got a gun." (*Id.* at 403). As a result, Deputy Brunswick tried to find a vantage point, which would provide him a safe shot, and was yelling "drop the gun, drop the gun." (*Id.*). He testified that he yelled "drop the gun" several times. (*Id.* at 424). Deputy Brunswick testified that the scuffle between Potts and John lasted "[s]econds." (*Id.* at 403–404). According to Deputy Brunswick, Potts eventually complied with his order to drop the gun. (*Id.* at 426).

-5-

Case No. 3:18-cv-451
Gwin, J.

{¶ 24} Deputy Brunswick identified State's Exhibit 7 as the gun he recovered from the scene—a GLOCK 19, 9–millimeter handgun. (*Id.* at 406–407). Deputy Brunswick testified that, when he recovered the gun, he found a bullet in the chamber of the gun. (*Id.* at 408). (*See also id.* at 434). According to Deputy Brunswick, Potts admitted that "he chambered one because he didn't feel safe." (*Id.* at 436).

{¶ 25} He further testified that the magazine for the gun, which he identified as State's Exhibit 8, was located under a bench on the front porch of the Shepard residence. (*Id.* at 414). He testified that there were 9 rounds of ammunition found in the magazine that holds 15 rounds. (*Id.* at 415). Deputy Brunswick identified as State's Exhibit 9 a photograph depicting the magazine as it was discovered on the Shepard's front porch. (*Id.* at 414). (*See* State's Ex. 9). (*See also* State's Exhibit 10). Deputy Brunswick identified as State's Exhibit 11 a knife that was discovered on Potts at the scene. (Dec. 7–10, 2015 Tr., Vol. II, at 429–430). (*See also* State's Ex. 12).

{¶ 26} He testified that Potts appeared to be intoxicated and that Potts stated "[n]ot enough" when Deputy Brunswick asked him how much alcohol he had consumed. (Dec. 7–10, 2015 Tr., Vol. II, at 439). Deputy Brunswick identified State's Exhibit 13 as a true and accurate photograph of the location at which Potts parked his vehicle in relation to the Shepard residence—down the street and several residences to the west from the Shepard residence. (*Id.* at 440–441, 443). Deputy Brunswick identified State's Exhibits 15, 16, 17, and 18 as true and accurate photographs depicting the injuries John sustained. (*Id.* at 446–449).

{¶ 27} On cross-examination, Deputy Brunswick testified that he saw only that the gun was pointed downward at John's legs during the struggle, and he testified that he did not hear Potts verbally threaten John. (*Id.* at 458).

{¶ 28} On re-cross examination, Deputy Brunswick testified that, when he arrived at the scene, he observed Potts holding the gun in a position that would allow him to discharge it. (*Id.* at 462).

{¶ 29} Detective Sergeant Jason Seem ("Detective Seem") testified for the State that he responded to the scene on June 25, 2015 to assist in the investigation.

Case No. 3:18-cv-451
Gwin, J.

(*Id.* at 510). Detective Seem identified State's Exhibit 20 as a diagram that he created depicting the scene. (*Id.* at 510–511).

{¶ 30} On cross-examination, Detective Seem testified that no one reported to him that Potts threatened John or that Potts pointed the gun at John. (*Id.* at 528). He also testified that the Shepards' front doors were not inspected for fingerprint evidence to substantiate whether Potts touched either door. (*Id.*).

{¶ 31} As its next witness, the State called John, who testified as to his interactions with Potts on September 28 and 29, 2014 and June 25, 2015. (Dec. 7–10, 2015 Tr., Vol. III, at 554, 558, 564, 584). He testified that, on September 28, 2014, he received a phone call from Potts asking him if he was a corrections officer with the Hancock County Justice Center, and asking him whether he knew Welly. (*Id.* at 558–561). He testified that the phone disconnected after Potts asked John whether he knew Welly but that Potts called again shortly thereafter; however, he did not answer Potts's second call. (*Id.* at 562). As part of the second call, Potts left a voicemail identifying himself and asking John to return his call. (*Id.* at 562–563). As a result of Potts's phone calls, John reported the phone calls to the Hancock County Sheriff's Office. (*Id.* at 563).

{¶ 32} John testified that Potts and Welly appeared at his residence the next day. (*Id.* at 564). He testified that Potts parked "on the far side of the driveway." (*Id.* at 570). John testified that Kim answered the door and that John later came to the door and heard Welly ask Kim whether she was married to John. (*Id.* at 567–568). John testified that Potts stated to him, "[Y]ou know what you did." (*Id.* at 568). At that time, John told Potts and Welly to leave; however, according to John, they did not initially leave and stayed on the front porch for "[p]robably 6 to 10 minutes." (*Id.* at 568–569). Because Potts and Welly did not leave John's property, he called the Hancock County Sheriff's Office. (*Id.* at 569). John testified that he applied for an order of protection against Potts the next day. (*Id.* at 570–571). John testified that an ex parte order of protection was granted but that he decided to not pursue the final order because he "was advised Mr. Potts was moving to Colorado." (*Id.* at 571–572). Instead, on November 7, 2014, John and Potts signed a "mutual agreement to avoid contact." (*Id.* at 572, 578).

{¶ 33} John testified that he learned on September 30, 2014 that Welly filed a complaint against him alleging that he sexually assaulted her. (*Id.* at 579–581).

Case No. 3:18-cv-451
Gwin, J.

{¶ 34} John testified that, on June 25, 2015, Potts appeared at his residence shortly after 10:00 p.m. (*Id.* at 584). John testified that he and Kim were sleeping when their barking dogs and the sound of their door bell woke them. (*Id.* at 590–591). He testified that he looked out his kitchen window to see who was at the door and, according to John, he did not recognize that it was Potts because he was "clean-shaven" and thought that Potts was a friend of his son. (*Id.* at 592, 594).

{¶ 35} Because he didn't recognize Potts, he went to open the door, and as soon as he turned the deadbolt to the front door, he was hit in the head with the door. (*Id.* at 594–595). Potts was attempting to shove the door open, so John tried to shut the door to keep him from entering his residence while yelling, "No. No." (*Id.* at 595). According to John, he shut Potts's arm in the door at least one time and after the third time he tried to force open the door, Potts succeeded and entered John's residence "[a] foot or two." (*Id.* at 596). John testified that Potts was pointing a gun at him when he entered his house. (*Id.* at 597). Yet, he testified that Potts did not make any statement to him while he was pointing the gun at him. (*Id.* at 598).

{¶ 36} At that point, John "grabbed the gun [with both of his hands] and forced [Potts] out the front door." (*Id.*). John testified that Potts then grabbed the gun with both hands to fight back. (*Id.*). John told Potts to drop the gun, let go of the gun, and "no, no." (*Id.* at 598–599). John testified Potts did not make any statement in response to John's declarations to him; however, "[l]ater in the struggle, he told [John] that [sic] just to let go of the gun." (*Id.* at 599). According to John, Potts was "very calm." (*Id.*).

{¶ 37} Eventually, the struggle led John and Potts from the front porch to the driveway and Deputy Brunswick arrived at the scene. (*Id.* at 602–603). John testified that Potts let go of the gun after being commanded to do so by Deputy Brunswick "at least three" times. (*Id.* at 603). John testified that he first learned of Potts's identity after asking Potts to reveal his identity while Deputy Brunswick was handcuffing Potts. (*Id.* at 604). According to John, Potts did not identify himself; rather, Potts responded to John by stating that he is "a rapist two times." (*Id.*). John further testified that after Potts called him a rapist, he "thought that must be Mr. Potts." (*Id.*).

-8-

Case No. 3:18-cv-451
Gwin, J.

{¶ 38} John testified that he sustained "an injury to [his] head, [he] had an injury to [his] feet, . . . [his] abdomen, [his] arms, . . . [and] a cut on some fingers on [his] hand." (*Id.* at 605). John identified as State's Exhibits 15, 16, 17, and 18 as true and accurate photographs depicting the injuries he sustained that night. (*Id.* at 605–608). John testified that he sought medical treatment because he "couldn't hardly talk" and was also treated for "abrasions to [his] foot, [his] legs, [his] arm, and [his] stomach," and he thought "a muscle pulled." (*Id.* at 611).

{¶ 39} John testified that the chain to the front screen door of his house was damaged and that a pin was broken off of the handle of the front door as a result of his altercation with Potts. (*Id.* at 587–588). (*See* State's Exs. 22, 23, 24).

{¶ 40} On cross-examination, John testified that, although he received training in writing incident reports for his employment as a corrections officer and was instructed by law enforcement on June 25, 2015 to write everything that happened during the incident with Potts, he did not write in his written statement that Potts pointed the gun at him. (*Id.* at 614–621). (*See also* Defendant's Ex. A).

{¶ 41} As its final witness, the State called Kim to testify. (Dec. 7–10, 2015 Tr., Vol. III, at 626). Kim testified that Potts and Welly came to her residence on September 29, 2014, and when she answered the door, Welly asked her whether she was married to John to which she responded, "Yes, can I help you." (*Id.* at 629–631). Kim testified that Welly did not say anything else and that Potts did not say anything until John came to the door and then said, "You know what you did." (*Id.* at 631). According to Kim, John shut the door and locked it. (*Id.* at 632). Kim testified that Potts and Welly remained on their front porch for about five minutes. (*Id.*).

{¶ 42} Kim testified that, on June 25, 2015, she was awakened by her barking dogs. (*Id.* at 635–636). According to Kim, John looked out the window to see who was at the door and he said to her, "I don't know who it is." (*Id.* at 636). Because the dogs were barking, she took the dogs to a back bedroom to allow John to speak with whoever was at the door. (*Id.*). Kim testified that, while she "was putting on [her] housecoat coming out of the bedroom," John unlocked the door and she "heard a noise, as if someone had thrown themselves against the door." (*Id.* at 637). When she came out of the bedroom, she "saw [her]

-9-

Case No. 3:18-cv-451
Gwin, J.

husband trying to keep the door closed, and a hand coming through the doorway, with what appeared to be a gun in the hand." (*Id.* at 637–638). According to Kim, John was yelling "no, no" and told her to call 911, which she did. (*Id.* at 639–640).

{¶ 43} Kim testified, "John reaches up and grabs the gun. He has two hands on it. The man comes through the door, he has two hands on it. And then my husband was able to push him out the front door, and they were struggling on the front porch." (*Id.* at 641). She further testified that when Potts came through the door, he came "[a] few steps into the entranceway" of the house. (*Id.* at 642). Kim testified that she remained on the phone with the 911 dispatcher throughout the incident. (*Id.* at 643). She also testified that she reported to the 911 dispatcher that she saw "a knife, a big, long knife in a sheath hanging from . . . his belt." (*Id.* at 644). However, Kim testified that Potts did not take the knife out of the sheath on his belt. (*Id.*). Kim testified that she did not hear Potts say anything during the incident. (*Id.* at 645).

{¶ 44} Thereafter, the State moved to admit exhibits and rested. (*Id.* at 654–655). State's Exhibits 1–27 and 29 were admitted without objection, and State's Exhibit 28 was excluded. (*Id.* at 655). Potts moved to admit Defendant's Exhibit A, which was admitted without objection. (*Id.* at 656). Next, Potts made a [Ohio Criminal Rule] 29(A) motion, which the trial court denied. (*Id.* at 656–660). Potts testified in his defense, and the defense rested. (*Id.* at 663, 720). The State did not present any witnesses on rebuttal, and the matter was submitted to the jury . . .

On December 10, 2015, the jury found Potts guilty of all crimes charged.[6] On January 21, 2016, the Hancock County Court of Common Pleas sentenced Potts 17-years' imprisonment, punishing Potts separately for felonious assault and aggravated burglary.[7]

On February 11, 2016, Potts appealed his conviction and sentence to the Ohio Court of Appeals,[8] raising the following error assignments:

---

[6] *State v. Potts*, 15-CR-00171, 2016 WL 8224345, at *1–2 (Ohio Com. Pl. Jan. 21, 2016).
[7] *State v. Potts*, 15-CR-00171, 2016 WL 8224346, at *1–2 (Ohio Com. Pl. Jan. 21, 2016).
[8] Doc. 9-2 at 65.

Case No. 3:18-cv-451
Gwin, J.

(1) The Trial Court erred when it refused to instruct the jury on the lesser related offense of Aggravated Menacing, in violation of Ohio Revised Code § 2903.21;

(2) The Trial Court abused its discretion when it would not allow further cross-examination on specific instances, pursuant to [Ohio Rules of Evidence 404 and 608(B)] of John Shepard's personnel file when it was clearly relevant and probative of truthfulness or untruthfulness;

(3) The Trial Court erred in overruling the motion for acquittal pursuant to [Ohio Criminal Rule] 29;

(4) The Trial Court erred when the Prosecutor, during closing arguments, indicated his opinion as to the credibility of witnesses during the trial. The Trial Court erred by not intervening *sua sponte*, due to the abuse of privilege; and

(5) The Trial Court erred by failing to merge the Aggravated Burglary and Felonious Assault convictions, at sentencing, as they occurred as part of the same transaction and both were borne of the same animus.[9]

### B. *State Appellate Proceedings*

On August 29, 2016, The Ohio Court of Appeals addressed each of Potts's claims on the merits and affirmed.[10]

On October 13, 2016, Potts timely requested an Ohio Supreme Court appeal,[11] raising the following issues:

(1) The presence of a second person in an occupied structure does not give rise to a separate offense of dissimilar import to prevent merger of felonious assault and aggravated burglary under [Ohio Revised Code §] 2925.25(B);

(2) The evidence in this case is insufficient to support a finding beyond a reasonable doubt that Appellant "caused or attempted to cause physical harm . . . by means of a deadly weapon" within the meaning of [Ohio Revised Code §] 2903.11(A)(2).[12]

---

[9] *Id.* at 81.
[10] *Potts*, 69 N.E.3d at 1233–53.
[11] Doc. 9-2 at 162.
[12] *Id.* at 217.

Case No. 3:18-cv-451
Gwin, J.

On May 17, 2017, the Ohio Supreme Court declined Potts's appeal.[13]

On May 2, 2018, over a year after the August 29, 2016 Ohio Court of Appeals decision affirming his sentence, Potts filed an application to reopen his appeal under Ohio Appellate Rule 26(B).[14] In his application, Potts argued that appellate counsel was ineffective for failing to raise an ineffective assistance of trial counsel claim on appeal related to trial counsel's failure to add victim John Shepard's Hancock County Sheriff's Department personnel record into evidence.[15]

Potts argued that the record showed that Shepard had been disciplined in the past for lying during internal investigations into his conduct as a corrections officer.[16] Because Shepard's testimony was central to the state's case against him, Potts argued, Potts' inability to impeach Shepard with these personnel records due to trial counsel's error constituted ineffective assistance that compromised Potts's Sixth Amendment confrontation right.[17] Appellate counsel was in turn ineffective, Potts claimed, for failing to raise this claim on appeal.

On June 7, 2018, the Ohio Court of Appeals denied Potts's reopening motion because it was filed well after the 90-day motion deadline and Potts had not shown good cause to excuse his delay. On July 23, 2018, Potts appealed the reopening denial to the Ohio Supreme Court. On October 10, 2018, Potts was denied leave to appeal.[18]

   *C. Federal Habeas Corpus Proceedings*

---

[13] *State v. Potts*, 74 N.E.3d 465 (Ohio 2017) (Table).
[14] Doc. 9-2 at 297–306.
[15] *Id.*
[16] *Id.*
[17] *Id.*
[18] *State v. Potts*, 108 N.E.3d 1103 (Ohio 2018) (Table).

Case No. 3:18-cv-451
Gwin, J.

On February 26, 2018, Potts petitioned this Court for federal habeas relief under 28 U.S.C. § 2254.[19]  Potts argues that he was entitled to habeas relief because (1) Potts was denied his Sixth Amendment confrontation right when the state trial court did not allow Potts to cross examine victim witness John Shepard using his Hancock County Sheriff's Department personnel file; (2) Potts's felonious assault conviction was based on insufficient evidence; and (3) Potts's separate punishments for burglary and felonious Assault violated the Fifth Amendment Double Jeopardy Clause.[20]  The state of Ohio opposes Potts's habeas petition.[21]

The Court now turns to Potts's petition.

## II.     LEGAL STANDARD

The Antiterrorism and Effective Death Penalty Act, or "AEDPA," allows federal courts to grant relief for "extreme" constitutional "malfunctions" in a petitioner's state criminal proceedings.[22]  AEDPA relief may address only federal constitutional concerns.  "[I]t is not the province of a federal habeas court to re-examine state-court determinations on state-law questions."[23]

AEDPA also affords Ohio courts the full and fair opportunity to first consider alleged violations of Ohio prisoners' federal rights before Ohio judgments may be collaterally challenged in federal court.[24]  Under Ohio procedural rules, appealing defendants forfeit

---

[19] Doc. 1
[20] Doc. 1-1.
[21] Doc. 9.
[22] *Brecht v. Abrahamson*, 507 U.S. 619, 634 (1993).
[23] *Stewart v. Winn*, 967 F.3d 534, 541 (6th Cir. 2020) (citing *Estelle v. McGuire*, 502 U.S. 62, 67–68 (1991)).
[24] *Duncan v. Henry*, 513 U.S. 364, 365 (1995) (per curiam).

-13-

Case No. 3:18-cv-451
Gwin, J.

claims not sequentially presented to Ohio appellate courts. Unless the defaulting defendant shows a compelling excuse, procedurally defaulted claims become unreviewable in federal habeas actions.[25]

Before this Court will consider Potts's claims, he must accordingly show that he has already exhausted his Ohio remedies by "fairly present[ing] his claim in each appropriate state court," "including a state supreme court with powers of discretionary review."[26]

For any non-defaulted claims, to obtain relief under AEDPA, Potts must show: (1) that the state court decisions he challenges were "contrary to or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States,"[27] and (2) that the federal error "had a substantial and injurious effect or influence in determining the jury's verdict."[28]

AEDPA is "not a substitute for ordinary error correction through appeal."[29] Accordingly, a state court decision must be not simply wrong but objectively unreasonable in a fundamentally prejudicial way to warrant § 2254 relief.[30]

III.    DISCUSSION

### A. Confrontation Claim

Potts's confrontation claim is procedurally defaulted. Though Potts raised the claim on direct appeal to the Ohio Court of Appeals,[31] he entirely omitted it from his Ohio Supreme

---

[25] *O'Sullivan v. Boerckel*, 526 U.S. 838, 848 (1999).
[26] *Baldwin v. Reese*, 541 U.S. 27, 29 (2004).
[27] 28 U.S.C. § 2254(d).
[28] *Brecht*, 507 U.S. at 638.
[29] *Harrington v. Richter*, 562 U.S. 86, 102–03 (2011).
[30] *Williams v. Burt*, 949 F.3d 966, 974 (6th Cir. 2020).
[31] Doc. 9-2 at 81.

Case No. 3:18-cv-451
Gwin, J.

Court notice of appeal.[32]  Potts then failed to present a timely ineffective assistance of appellate counsel claim under Ohio Appellate Rule 26(B), similarly defaulting any viable collateral claim.

Any ineffective assistance of Potts's counsel, whether on discretionary appeal to the Ohio Supreme Court or in collateral reopening proceedings under Ohio Appellate Rule 26(B), cannot serve as cause and prejudice to excuse Potts's default.  In neither his Rule 26(B) motion nor his request to have the Ohio Supreme Court review his case was Potts entitled to counsel.[33]  Potts therefore did not have the right to effective assistance of counsel in either proceeding.[34]

Thus, Potts's confrontation claim, and any ineffective assistance of trial or appellate counsel claims that might revive his underlying confrontation claim, are procedurally defaulted without exculpatory cause and prejudice.[35]  The Court therefore declines to review Potts's confrontation claim or any ineffective assistance of counsel claim related to it.

B.  *Sufficiency of the Evidence Claim*

Potts next claims that the prosecution did not sufficiently prove his felonious assault offense, in violation of the Fourteenth Amendment.  Unlike his confrontation claim, Potts's sufficiency of the evidence claim was properly presented to the Ohio courts and is preserved

---

[32] *Id.* at 216–29.

[33] *Pennsylvania v. Finley*, 481 U.S. 551, 555 (1987) ("[T]he right to appointed counsel extends to the first appeal of right, and no further.").

[34] *Coleman v. Thompson*, 501 U.S. 722, 757 (1991) ("Because Coleman had no right to counsel to pursue his appeal in state habeas, any attorney error that led to the default of Coleman's claims in state court cannot constitute cause to excuse the default in federal habeas.").

[35] *Edwards v. Carpenter*, 529 U.S. 446, 453 (2000) ("[A]n ineffective-assistance-of-counsel claim asserted as cause for the procedural default of another claim can itself be procedurally defaulted.").

-15-

Case No. 3:18-cv-451
Gwin, J.

for federal habeas review.  Even so, to obtain relief, Potts must still show that the last reasoned state court decision affirming his conviction and sentence: (1) was "contrary to or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," and (2) that the federal error "had a substantial and injurious effect or influence in determining the jury's verdict." [36]

While substantial prejudice would be clear if Potts could demonstrate an unreasonable federal error here, no such error occurred at Potts's trial.  Potts's claim confronts two separate high legal bars: the sufficiency of the evidence standard and AEDPA deference.

Regarding the former, sufficiency of the evidence challenges are difficult hills to climb even on direct review.  True, the prosecution bears the federal constitutional burden of proving each of the charged crime's elements beyond a reasonable doubt. [37]  But once a defendant has been convicted, his sentence must be affirmed if "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." [38]

Further, when a federal habeas court considers a state court's sufficiency of the evidence decision on collateral review, AEDPA bolsters the already deferential *Jackson* standard. [39]  This means the federal habeas court must affirm a state sufficiency of the

---

[36] *Davis v. Ayala*, 576 U.S. 257, 268–70 (2015) (citing 28 U.S.C. § 2254(d)).

[37] *In re Winship*, 397 U.S. 358, 361 (1970).

[38] *Jackson v. Virginia*, 443 U.S. 307, 319 (1979).

[39] *Thomas v. Stephenson*, 898 F.3d 693, 698 (6th Cir. 2018).

Case No. 3:18-cv-451
Gwin, J.

evidence decision if any reasonable jurist could conclude, as the state court did, that the prosecution satisfied its burden.[40]

     In determining whether the state court decision was unreasonable, we are bound by Ohio courts' interpretation of Ohio law.[41]  Petitioner Potts was convicted of felonious assault under Ohio Revised Code § 2903.11(A)(2), which forbids an individual to "cause or attempt to cause physical harm to another or to another's unborn by means of a deadly weapon or dangerous ordnance."  The parties agree both that the firearm Potts used in the offense was a deadly weapon and that Shepard was not physically harmed by the gun during the June 25, 2015 struggle.  The question for the Court, therefore, is whether Potts *attempted* to harm Shepard with the gun.

     The Ohio Supreme Court has held that a defendant commits a criminal attempt when he "purposely does or omits to do anything which is an act or omission constituting a substantial step in a course of conduct planned to culminate in his commission of the crime."[42]  A "substantial step," in turn, is conduct "strongly corroborative of the actor's criminal purpose."[43]  But a substantial step "need not be the last proximate act prior to the consummation of the felony."[44]

---

[40] *Id.*

[41] *Bradshaw v. Richey*, 546 U.S. 74, 76 (2005) ("We have repeatedly held that a state court's interpretation of state law, *including one announced on direct appeal of the challenged conviction*, binds a federal court sitting in habeas corpus.") (collecting cases) (emphasis added).

[42] *State v. Brooks*, 542 N.E.2d 636, 641 (Ohio 1989).

[43] *Id.*

[44] *Id.*

-17-

Case No. 3:18-cv-451
Gwin, J.

Viewing the evidence in the light most favorable to the prosecution, a rational trier of fact could have found that on June 25, 2015, Potts intended to cause Shepard physical harm with a firearm and took a substantial step toward doing so.

Potts testified that he went to Shepard's house at night armed with a knife and loaded handgun despite a prior criminal trespass warning and a mutual no-contact agreement.[45] Shepard testified that when he went to answer the door after Potts knocked, Potts threw himself into the door attempting to gain entry, striking Shepard in the head and breaking the door chain that secured Shepard's home.[46]  While Shepard was attempting to push Potts outside the house and shut the door, Potts stuck his arm through the door and pointed a loaded firearm at Shepard.[47]  Shepard managed to grab Potts's gun with both hands, and the men struggled over the weapon until police arrived.[48]

Though Potts emphasizes the fact that he never fired the weapon and never verbally threatened Shepard, a reasonable jurist could have found that a reasonable jury could have believed that Potts intended to use the gun to harm Shepard.  Potts pointed the gun at Shepard, repeatedly attempted to enter Shepard's house with it, and struggled with Shepard over the gun when Shepard resisted Potts.[49]

Potts's conduct before June 25, 2015, further corroborated Potts's criminal intent, as Potts had a revenge motive to harm Shepard after Potts's girlfriend made sexual assault allegations against Shepard.[50]  Though those allegations were disputed, Potts indicated that

---

[45] Doc. 9-5 at 44–45.
[46] *Id.* at 14–17.
[47] *Id.* at 17, 22.
[48] *Id.* at 17–18.
[49] *Id.* at 14–22.
[50] *Id.* at 44–45.

Case No. 3:18-cv-451
Gwin, J.

he still believed his girlfriend and was concerned that Shepard would again sexually assault her while she served her short falsification sentence, prompting Potts to visit Shepard on the night of the assault.[51]

Also, Potts's June 25, 2015 conduct considerably escalated the Potts and Shepard hostilities.  In the earlier contact, Potts left his unloaded firearm in his car.[52] By contrast, on June 25, 2015, Potts brought the firearm with a loaded magazine and chambered round as well as a knife to Shepard's door.[53]

Notably, on the latter occasion, Potts was already defying a no-contact agreement and criminal trespass warning by coming to Shepard's home.  And Potts did so with a renewed sense of danger, at least in Potts's mind, that Shepard would harm Potts's girlfriend.[54]  Also, on the night of the June 25, 2015 assault, Potts parked his car in an inconspicuous place away from Shepard's residence with easy highway access—in contrast with their first encounter when Potts pulled into Shepard's driveway.[55]

Potts's arguments about different ways to weigh the evidence are inappropriate here. In this habeas review of Potts's insufficiency argument, the Court views the evidence in the light most favorable to the prosecution.[56]  Doing so here shows that it was reasonable for the Ohio Court of Appeals to conclude that the jury reasonably convicted Potts of felonious assault.[57]

---

[51] *Id.*
[52] *Id.* at 43.
[53] Id. at 45.
[54] *Id.* at 44–45.
[55] *Id.* at 45.
[56] *Jackson*, 443 U.S. at 319.
[57] *Thomas*, 898 F.3d at 698.

-19-

Case No. 3:18-cv-451
Gwin, J.

Potts's reliance on the Sixth Circuit's decision in *Nash v. Eberlin*[58] is similarly misguided.  In *Nash*, the Sixth Circuit on federal habeas review of an Ohio felonious assault conviction found that the petitioner's conduct of pointing a gun at his wife to "scare" her and accidentally firing the gun during a struggle over the firearm was insufficient evidence that the petitioner attempted to cause his wife physical harm.[59]

*Nash* is distinguishable from this case for several reasons:  First, this case involves a continuing dispute and escalating hostilities between the defendant and victim.  Second, Potts, unlike Nash, committed aggravated burglary against the victim, struck the victim in the head with the door, and stuck a firearm through the door while pointing it at the victim.  Third, Potts was armed with multiple deadly weapons.  Fourth, Potts parked his car to make a quick getaway after the assault.  And fifth, Potts had a clear revenge motive against Shepard and perceived need to protect his girlfriend from further harm at the hands of Shepard.

All told, there is stronger corroborative evidence of Potts's intent to harm Shepard than there was in *Nash*.  Viewing this evidence in the light most favorable to the prosecution, it was reasonable for the Ohio Court of Appeals to affirm Potts's felonious assault conviction.[60]

### C.  Double Jeopardy Claim

Finally, Potts argues that his separate convictions and punishments for aggravated burglary and felonious assault violate the Fifth Amendment's Double Jeopardy Clause.[61]

---

[58] *Nash v. Eberlin*, 258 F. App'x 761 (6th Cir. 2007).
[59] *Id.* at 765–68.
[60] *Thomas*, 898 F.3d at 698.
[61] Doc. 1-1.

-20-

Case No. 3:18-cv-451
Gwin, J.

Potts properly preserved his double jeopardy claim for habeas review by raising it before the Ohio Court of Appeals and the Ohio Supreme Court.[62]

The Double Jeopardy Clause forbids multiple punishments for the same offense.[63] Whether two offenses are in fact "the same offense" is a question of legislative intent.[64] And in this federal habeas posture, legislative intent is an Ohio law question.[65] In evaluating a double jeopardy habeas claim, this Court is accordingly bound by the Ohio courts' interpretation of the Ohio legislature's intent in defining criminal offenses.[66] And a remedy is available to a federal habeas petitioner only where an Ohio court ignores the legislature's intent in punishing the petitioner's crimes separately.[67]

To determine whether multiple offenses may garner separate punishments, Ohio courts ask three questions: "(1) Were the offenses dissimilar in import or significance? (2) Were they committed separately? and (3) Were they committed with a separate animus or motivation?"[68] If the court answers any one of these questions affirmatively, Ohio law authorizes multiple punishments for multiple offenses.[69]

Applying this test, the Ohio Court of Appeals concluded that Potts's felonious assault and aggravated burglary convictions had separate import because they had distinct victims—

---

[62] Doc. 9-2 at 81, 217.

[63] *Brown v. Ohio*, 432 U.S. 161, 165 (1977).

[64] *Volpe v. Trim*, 708 F.3d 688, 696–97 (6th Cir. 2013).

[65] *Id.* at 697.

[66] *Id.*

[67] *Jackson v. Smith*, 745 F.3d 206, 214 (6th Cir. 2014) ("At worst, the state court incorrectly applied Ohio's allied offenses statute to determine the legislature's intent.  Habeas relief, especially when circumscribed by § 2254(d)(1), is not available for such alleged errors.") (footnote omitted).

[68] *State v. Ruff*, 34 N.E.3d 892, 899 (Ohio 2015).

[69] *Id.*

-21-

Case No. 3:18-cv-451
Gwin, J.

John Shepard for the felonious assault and John and Kim Shepard for the aggravated burglary.[70]  We are bound by the Ohio courts' interpretation of Ohio law.  Because the Ohio Court of Appeals conclusion that Kim Shepard was a victim of Potts's aggravated burglary offense was factually reasonable,[71] no double jeopardy violation occurred in Potts's state court proceedings.[72]

In a last gasp effort to challenge the Ohio Court of Appeals separate victims finding, Potts argues that the indictment and bill of particulars identified only John Shepard as the victim of Potts's crimes.  But even if this claim could otherwise support federal habeas relief, it is factually inaccurate.  The September 29, 2015 Hancock County bill of particulars specifically states that "John and Kimberly Shepard were present in the residence" at the time Potts committed the felonious assault and aggravated burglary.[73]

IV. CONCLUSION

For these reasons, the Court **DENIES** Potts's 28 U.S.C. § 2254 petition.

IT IS SO ORDERED

Dated:  February 22, 2021                    s/      *James S. Gwin*
                                             JAMES S. GWIN
                                             UNITED STATES DISTRICT JUDGE

---

[70] *Potts*, 69 N.E.3d at 1252–53 (citing *Ruff*, 34 N.E.3d at 898 ("We therefore hold that two or more offenses of dissimilar import exist within the meaning of [Ohio Revised Code §] 2941.25(B) when the defendant's conduct constitutes offenses involving separate victims or if the harm that results from each offense is separate and identifiable.")).
[71] 28 U.S.C. § 2254(d)(2), (e)(1).
[72] *Smith*, 745 F.3d at 214.
[73] Doc. 9-2 at 5.